IN THE ESTATE OF ALBERT SIDNEY JENKINS, SR., DECEASED

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-164-CV

IN THE ESTATE OF 

ALBERT SIDNEY JENKINS, SR., DECEASED

------------

FROM THE COUNTY COURT AT LAW OF WISE COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

In three issues, Appellant Joseph Wesley Jenkins (“Joe”) challenges the legal and factual sufficiency of three findings of fact made by the trial court, following a trial to the bench, that (1) Albert S. Jenkins Sr. (the “Decedent”) did not make a parol gift to Joe of a five-acre tract of land; (2) Joe did not take possession of the land under a gift from the Decedent; and (3) Joe did not make substantial, valuable, and permanent improvements to the land.  We affirm.

II.  Background—Procedural

This is the case of the squabbling siblings.  The Decedent had four children, Albert Jr., Joe, David, and Charlotte, amongst whom his estate was to be divided equally.  The Decedent resided on 68.62 acres in Wise County and had deeded small tracts to Albert Jr. and David but not to Joe and Charlotte.  Albert Jr., as independent executor of the Decedent’s estate, filed an “Application for Partition and Sale of Real Property” because such a sale was not authorized by the Decedent’s will.  Charlotte and Joe filed general denials to the application, while David and Albert Jr. filed waivers of citation, as did Lindsay Ann Smith, a stepdaughter of Decedent who had been assigned a portion of Albert Jr.’s and Charlotte’s interests.

A jury trial was held February 10, 2004.  Joe and Charlotte argued that the Decedent had made an oral gift of five-acre portions of the 68.62-acre tract to each of them.  The trial court found against Joe on this issue, but found in favor of Charlotte to the extent of a 2.18-acre gift.  The court further found that the land could be partitioned only by sale, thereby granting the request to sell the property.  Only Joe has appealed the trial court’s ruling.

III.  Background—Evidentiary

The following is a summary of the evidence presented by Joe.  

Joe testified that he lived on a five-acre tract of land since 1999 and indicated the boundaries on a diagram of the land.  Joe further testified that his father came to the site and advised him on “how I should do stuff.”

According to Joe, in reliance of his father’s gift of the land, he and his wife bought a trailer house and moved on the land.  Joe speculated that the reason Albert Jr. and David got land deeded to them, while Charlotte and he never received a deed, was because he had a long history of drug use coupled with numerous trips to the penitentiary.  He testified that his father was afraid he would trade the land for drugs.

On cross-examination, Albert Jr. admitted that he had talked to Charlie Rhine about building a fence around Joe’s property so that Rhine, who leased part of the sixty-eight acres for grazing, could keep his stock in, because Joe would never close the gate and the cattle would get out.

Terry Lewis testified he was a water well driller and had drilled a water well on the land for both Joe and Charlotte.  When asked why the Decedent told him that he gave the subject land to Joe and Charlotte, Lewis replied, “He said he [gave] all his kids five acres.”

E.B. Jenkins, who was a brother of the Decedent, testified that he was told by the Decedent that he was going to dig him a well and give Joe five acres.  Later, E.B. said the Decedent told him he gave Joe five acres of land.  E.B. also confirmed that the Decedent wanted all of his children to have four or five acres of land.

Edgar Jenkins Jr., a nephew of the Decedent, told the court that on the occasion after Joe was on the land, the Decedent told Joe, in Edgar’s presence, that he needed to fence his land off.

Charles Rhine traced an outline of Joe’s property on the map of the 68 acres.  Rhine further testified that Albert Jr. had a conversation with him about building a fence to keep his cows on the property he leased for grazing and that Albert Jr. reduced the amount of rent because Rhine could not use all of the property. 

Preston Lowery testified that he heard the Decedent say he had given land to each of his children to build a house.

Francis Jenkins testified that she was a sister-in-law to the Decedent and he told her that he had given each of his children five acres of land, beginning with Charlotte, then Albert Jr., then David, and finally Joe in 1999.  This witness further stated that Albert Jr. and David both knew that Decedent gave Joe and Charlotte the land.

Danny Winans, who was a nephew of the Decedent, testified that he was with the Decedent when the Decedent said he put Joe on the road so “I [could] keep an eye on him.”  Winans further testified the Decedent wanted him to do some wiring on Joe’s land.  Winans also wired Charlotte’s land.

Gary Grubbs testified that he designed septic systems.  Grubbs identified Joe’s exhibit one, which was identified as an application to the Wise County Department of Public Works for the installation of a septic system in the name of Joe and his wife.  Grubbs further described the location of the five acres on the map.

Della Mable Petty, whose daughter bought groceries for the Decedent, told the court that the Decedent told her and her daughter that he gave Joe the five acres where his trailer was sitting.

Thomas Lynn Lackey testified he was a friend of the Decedent and he had known him for forty-five years.  Lackey said while they were both in “rehab” together for heart problems, the Decedent told him he had given each of his children five acres and most of them were living on it.

Joe testified that when the Decedent had paid for things that went on the land Joe claimed had been gifted to him, he repaid the Decedent in cash, but Joe could not provide proof that he either paid for or reimbursed the Decedent for these items.

The following is evidence presented on behalf of Albert Jr. as independent executor of the Decedent’s estate.

Joe admitted that the reason his father did not give him a deed to the five-acre tract was that he was afraid the property would be used to buy drugs.  Joe stated, “All I know is that he didn’t want us squandering it off. . . . He might have been afraid I was going to trade it for some dope.”  When asked whether he paid the property taxes on the property, Joe replied, “No.  It wasn’t deeded to me yet.”

Albert Jr. stated that the Decedent simply “furnished [Joe] land to live on.”  Albert Jr. also testified that the Decedent “always told me he could never give [Joe any] land because he’d probably hock it and sell it and he’d have to furnish [him] another place to live.”  The Decedent further told Albert Jr. that he never gave such land to Joe.  Albert Jr. was clear that the Decedent did not give Joe a deed to the property.

Albert Jr. further testified about a conversation he had with Decedent in which Decedent stated that he wanted Albert Jr. to sell the real property after his death, and that the Decedent recognized that Joe would be forced to move.  Specifically, Albert Jr. testified as follows:

It was probably two or three years before he died.  And at that time Joe was living there.  And we had been to town and come back, and we were talking.  And I asked him how he wanted me to divide the property.  And he says — I said, “What do you want me to do about the property because how are we going to divide it?  What do you want to do about it?”  He said, “You’ll just have to take care of it after I die.”  I said, “Well the only way I know to do is to have to sell it and then divide the money and Joe and Charlotte will have to move.”  He said, “Whatever you have to do, you have to do . . . You just have to handle it when I die.”

Albert Jr. also testified that the Decedent “told me he couldn’t [give Joe a deed to the property] because he’s always afraid that if he gave them [the] deed, then they would take that deed and either borrow money against it and loose [sic] the property and then he’d have to give them more property to have a place to live.”

David Jenkins testified, when asked whether the Decedent ever gave any portion of the real property to Joe, “To my knowledge, no.”  When asked why, he replied, “Because he told me he could not give him any property because he was afraid they’d sell it or hock it off and he’d have to give them more.” 

Charlotte Jenkins Chapman testified that Albert Jr.’s divorce was the reason the Decedent did not give part of the real property to Joe, “because he did not want us, if we ever got a divorce, to have to go through what [Albert Jr.] had to go through.”

Lindsay Ann Smith testified that the Decedent invited her to live on the real property, but would not execute or deliver a deed to her.  When asked why Joe never received a deed to the property, she replied that the Decedent didn’t want the land to be “tied up with drug—get it involved in some kind of drug use.  And that’s why he didn’t—didn’t put it in their names.”  Smith testified that she never moved onto the real property because the Decedent 

never would give us the—a deed.  He said he would drill the water well.  He would do septic system, set the electricity, just move our mobile home out there.  And my husband was wise enough to say, no, not unless we have a clear deed.  Otherwise I would be in the same position that Joe and Charlotte is in. . . . [H]e would not give me a clear deed to the property as he didn’t for Charlotte and for Joe.

Grubbs, who installed a septic system on the real property for Joe’s trailer, had an opportunity to speak with the Decedent concerning the real property, and the Decedent specifically indicated that the property did not then belong to Joe.  Asked whether the Decedent said anything to him about giving Joe five acres, he replied, “The only thing I can refer to along that line is—said basically put it [septic system] where he wants it, you know, if there’s a problem, you know, 
be the kids later on anyway
.”  [Emphasis added.]

The Decedent’s brother, E.B. Jenkins, testified that the Decedent “never did get around to that deed . . . . They [Joe and Charlotte] never did have it surveyed off and get the deed stated.  That’s the process of owning land, you know, or anything. . . .  Especially land.  You got to get it surveyed and then a deed.”

Albert Jr. testified that Joe lived with the Decedent off and on for many years, at more than one location on the real property, and at times in the Decedent’s house with him.

Edgar Jenkins, the Decedent’s nephew, testified, “It is common knowledge that [the Decedent] wanted all of his kids to have a place to live.” Lindsey Ann Smith testified that the Decedent “wanted us all to have a place to live.”  The Decedent continued to pay all property taxes on the real property and made improvements to and paid for the installation of the water well, septic system, and electricity, and even bought the trailer in which Joe resided.

Gary Grubbs testified that the Decedent directed the location and installation of the septic system for the trailer purchased by the Decedent for Joe.  Albert Jr. testified that the Decedent drilled a well and installed a septic system running to the trailer.  Similarly, Terry Lewis, a water well driller, testified that he spoke with the Decedent and made arrangements with the  Decedent concerning the water well to run to the trailer in which Joe resided.

Steve Goolsby, the real estate appraiser who appraised the real property, testified that he appraised the entire tract at $216,000.  At trial, he stated the value could have been as high as $230,000 if Joe and Charlotte would remove the unsightly materials and manufactured homes placed on the property by them.  Goolsby also testified that the manufactured homes, the cars, and other debris were not considered valuable and did not increase the value of the real property.  He further testified that the old equipment and items placed upon the property by Joe, considering its close proximity to the frontage road, affects the marketability and the overall appeal of the entire property.  Joe, Charlotte, and Albert Jr. all testified that the trailer in which Joe resided was capable of being moved.

Albert Jr. testified that the Decedent paid for Joe’s well and septic tank and did so because he “took care of Joe and Charlotte all their life.”  Albert Jr. testified that the check admitted into evidence as plaintiff’s exhibit 14 shows payment for Joe’s septic tank permit and water well.  Likewise, Terry Lewis, who installed the water well, testified that the Decedent paid for Joe’s water well and installation.  The Decedent’s brother, E.B. Jenkins, testified that the Decedent paid for Joe’s septic system.  Danny Winans, the electrician who wired Joe’s trailer, stated that the Decedent paid for the trailer to be wired. Finally, David Jenkins testified that the Decedent purchased Joe’s trailers.

IV.  Standard of Review—Legal and Factual Sufficiency

A legal sufficiency challenge may only be sustained when:  (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.  
Uniroyal Goodrich Tire Co. v. Martinez
, 977 S.W.2d 328, 334 (Tex. 1998),
 cert. denied
, 526 U.S. 1040 (1999);
 Robert W. Calvert, 
"No Evidence"
 
and "Insufficient Evidence" Points of Error
, 38 T
EX
. L. R
EV
. 361, 362-63 (1960)
.  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable factfinder could not.
  
City of Keller v. Wilson
, 
168 S.W.3d 802, 827
 (Tex. 2005). 

Anything more than a scintilla of evidence is legally sufficient to support the finding.  
Cont’l Coffee Prods. Co. v. Cazarez
, 937 S.W.2d 444, 450 (Tex. 1996); 
Leitch v. Hornsby
, 935 S.W.2d 114, 118 (Tex. 1996).  
When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.  
Kindred v. Con/Chem, Inc.
, 650 S.W.2d 61, 63 (Tex. 1983).  More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact.  
Rocor Int’l, Inc. v. Nat’l Union Fire Ins. Co.
, 77 S.W.3d 253, 262 (Tex. 2002).
 

Any ultimate fact may be proved by circumstantial evidence.  
Russell v. Russell,
 865 S.W.2d 929, 933 (Tex. 1993).  A fact is established by circumstantial evidence when the fact may be fairly and reasonably inferred from other facts proved in the case.  
Id
.  However, to withstand a legal sufficiency challenge, circumstantial evidence still must consist of more than a scintilla.  
Blount v. Bordens, Inc.
, 910 S.W.2d 931, 933 (Tex. 1995).

An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.  
Garza v. Alviar
, 395 S.W.2d 821, 823 (Tex. 1965).  We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding.  
Mar. Overseas Corp. v. Ellis
, 971 S.W.2d 402, 406-07 (Tex.), 
cert. denied
, 525 U.S. 1017 (1998).

Findings of fact are the exclusive province of the jury and/or trial court.  
Bellefonte Underwriters Ins. Co. v. Brown
, 704 S.W.2d 742, 744-45 (Tex. 1986).  A court of appeals cannot make original findings of fact; it can only “unfind” facts.  
See Tex. Nat'l Bank v. Karnes
, 717 S.W.2d 901, 903 (Tex. 1986).

V.  Parol Gift of Land

The parties agree that to relieve a parol gift of land from the Staute of Frauds it must be shown that there was (1) a present intent to make a gift, (2) possession by the donee, and (3) valuable and permanent improvement made upon the land by the donee with the consent of the donor.  
See Hooks v. Bridgewater
, 111 Tex. 122, 229 S.W. 1114, 1116-17 (1921); 
Davis v. Douglas
, 15 S.W.2d 232, 233-34 (Tex. Comm’n App. 1929, holding approved).  Because it is necessary for Joe to prove each of the three foregoing elements, and because the trial court found that none had been proven by Joe with regard to the three issues in this appeal, it is necessary for him to prevail on all three issues to warrant a reversal of the trial court’s judgment.  

VI.  Analysis

With regard to the legal sufficiency point, and considering the evidence  favorable to the finding if a reasonable factfinder could, and disregarding evidence contrary to the finding the unless a reasonable factfinder could not, and bearing in mind that anything more than a scintilla is legally sufficient to support the finding, we hold that the evidence is legally sufficient to support the trial court’s findings of fact in issue in this appeal.  

With regard to the factual sufficiency point, and considering all the evidence in the case in making a determination, we hold that the evidence is not so weak or that evidence to the contrary is so overwhelming that the trial court’s findings of fact in issue in this appeal should be set aside.

VII.  Conclusion

Having overruled the legal and factual sufficiency issues brought by Joseph Wesley Jenkins, we affirm the judgment of the trial court.

PER CURIAM

PANEL F: MCCOY, LIVINGSTON, and DAUPHINOT, JJ.

DELIVERED: May 25, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P. 
47.4.